## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Jamie Hill and Kathryn Neild, as representatives of a class of similarly situated persons, and on behalf of the Mercy Health Corporation Employees' Retirement Plan, the Rockford Health System Retirement Plan, and the Rockford Health Physicians Retirement Plan, <br><br> Plaintiffs, <br> v. <br><br> Mercy Health Corporation, Mercy Health System Corporation, and Does 1-20, <br><br> Defendants. | Case No. 3:20-cv-50286 <br><br> **COMPLAINT** <br> **CLASS ACTION** |

## <u>NATURE OF THE ACTION</u>

1.     Plaintiffs Jamie Hill and Kathryn Neild ("Plaintiffs"), as representatives of the class defined herein, and on behalf of the Mercy Health Corporation Employees' Retirement Plan ("Mercy Plan"), the Rockford Health System Retirement Plan ("RHS Plan), and the Rockford Health Physicians Retirement Plan ("RHP Plan") (collectively, the "Plans"), bring this action under the Employee Retirement Income Security Act ("ERISA") against Defendants Mercy Health Corporation, Mercy Health System Corporation, and Does 1-20 ("Defendants"). As described herein, Defendants have breached their fiduciary duty under ERISA by (1) failing to monitor and control the fees paid by the Plans and (2) failing to monitor the investment performance of certain funds. Defendants' actions and omissions have caused millions of dollars in losses to the Plans. Plaintiffs bring this action to recover all losses to the Plans, prevent further similar conduct, and obtain equitable and other relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.      Americans have approximately $6.5 trillion invested in private sector defined contribution retirement plans, such as 401(k) and 403(b) plans. Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. Only around 8% of non-union U.S. workers in the private sector participate in a defined benefit plan.

3.      The potential for imprudence is much greater in defined contribution plans than in defined benefit plans. In a traditional defined benefit plan, each participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized. In this scenario, the employer bears all risk related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). The employer has every incentive to avoid unnecessary expenses and remove imprudent investments.

4.      Defined contribution plan benefits are not so secure. In a defined contribution plan, participants' retirement benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). The employer controls the investments that will be offered, yet the employees bear all risk related to excessive fees and investment underperformance. The employees do not have the benefit of an employer obligated to fund any shortfall due to excessive fees or poor investment performance.

5.      To safeguard retirement plan participants, ERISA imposes strict fiduciary duties upon plan sponsors and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These duties are "the highest known to the law." *George v. Kraft Foods Glob., Inc.*, 814 F. Supp. 2d 832, 852 (N.D.

2

Ill. 2011) (citation omitted). Fiduciaries must act with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope (among other duties). 29 U.S.C. § 1104(a)(1)(B).

6. Defendants failed to employ a prudent process for managing the Plans and failed to prudently monitor and control the Plans' fees. Instead, Defendants allowed the Plans to pay excessive sales commissions on investment products and services. These sales commissions have increased the investment fund fees that the Plans' participants must pay by as much as 135%. Likewise, an add-on investment service in the Plans that utilizes an outside firm to choose participants' investments (known as a "managed account service") charges a hefty fee mark-up to generate commissions.

7. Other similar plans that offer the same investment funds and managed account service do not pay these exorbitant commissions. To the extent that the Plans receive any services in exchange for the added fees, the same services could be procured at around one-tenth of the cost or less. Indeed, in a group of more than 650 similar plans, Defendants authorized the largest commission payment of them all. Defendants' lonely position among peers illustrates Defendants' failure to prudently monitor and control the Plans' costs on behalf of participants.

8. Defendants also failed to monitor the performance of certain investment funds held by the Plans. The Plans' investment options include several funds managed by an affiliate of the Plans' administrative services vendor, Voya. These funds appear to have been promoted by Voya, yet there is no reasonable fiduciary basis for Defendants to retain them. The funds have consistently underperformed their benchmark indexes, and the investment marketplace for similarly-sized plans is replete with lower cost, better performing funds. Defendants' retention of

these funds illustrates Defendants' failure to prudently monitor the Plans' investment performance on behalf of participants.

9.      Based on this conduct and other conduct alleged herein, Plaintiffs assert a claim against Defendants for breach of the duty of prudence under ERISA.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

11.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plans are administered, where the breaches of fiduciary duty giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

*Plaintiffs*

12.     Plaintiff Jamie Hill resides in Rockford, Illinois and was a participant in the Mercy Plan, the RHS Plan, and the RHP Plan until January 2020. During all times that the Plans were administered by Defendants, Plaintiff Hill's accounts were invested in an American Funds target date fund that cost more than the same fund in other similar plans due to a fee markup that generates commissions. Plaintiff Hill has been financially injured by the imprudent conduct described herein, and Hill's account distributions from the Plans would have been greater if Defendants had not violated their fiduciary duties under ERISA as described herein.

13.     Plaintiff Kathryn Neild resides in Milton, Wisconsin and is a current participant in the Mercy Plan. Plaintiff Neild is enrolled in the managed account service. Through this service, Plaintiff Neild's account is invested in numerous funds that cost more than the same funds in other similar plans due to fee markups that generate commissions. Plaintiff Neild's account is also

4

invested in an underperforming fund affiliated with the Plans' administrative services vendor, Voya (and may be invested in other such funds in the future, as the managed account allocation model makes changes to her account). Additionally, the managed account service charges Plaintiff Neild inflated fees beyond the cost of the same service in other similar plans to generate commissions. Plaintiff Neild has been financially injured by the imprudent conduct described herein, and Neild's account would be worth more today if Defendants had not violated their fiduciary duties under ERISA as described herein.

**Defendants**

14. Defendant Mercy Health Corporation ("Mercy Health") is the common parent of affiliated health care providers that operate as a single health care system known as Mercy Health. Since 2017, Mercy Health has been the "plan sponsor" of the Plans within the meaning of 29 U.S.C. § 1002(16)(B). According to the Plans' Form 5500s, Mercy Health is also the "administrator" of the Plans within the meaning of 29 U.S.C. § 1002(16)(A).[1] As the administrator of the Plans, Mercy Health exercises discretionary authority or discretionary control with respect to the administration of the Plans and management and disposition of the Plans' assets. Mercy Health is therefore a fiduciary under 29 U.S.C. § 1002(21)(A).

15. Defendant Mercy Health System Corporation ("System Corporation") is a subsidiary of Mercy Health. Prior to 2017, System Corporation was the "plan sponsor" of the

---

[1] Form 5500s for the RHP Plan are ambiguous. The administrator of the RHP Plan is designated "same as sponsor", yet there are conflicting "sponsor" designations. The Auditor's Report (attached to Form 5500) states that Mercy Health Corporation became the sponsor in 2017, while the first page of the Form continues to identify Rockford Health Physicians as the sponsor. To the extent Rockford Health Physicians remains the official sponsor and administrator, it appears that Mercy Health is the de facto or functional fiduciary responsible for hiring service providers and maintaining the investment menu. The RHP Plan was overhauled in 2017 to mirror the Mercy Plan and other legacy Rockford plans under Mercy Health's control. *See infra*, ¶¶ 19-20.

Mercy Plan within the meaning of 29 U.S.C. § 1002(16)(B). According to the Mercy Plan's Form 5500s for 2014-2016, System Corporation was also the "administrator" of the Mercy Plan within the meaning of 29 U.S.C. § 1002(16)(A). As the administrator of the Mercy Plan, System Corporation exercised discretionary authority or discretionary control with respect to the administration of the Mercy Plan and management and disposition of the Mercy Plan's assets. System Corporation is therefore a fiduciary under 29 U.S.C. § 1002(21)(A).

16. Defendants may delegate their fiduciary responsibilities to any other person, persons, or entity. Any individuals or entities not named in this Complaint to whom Defendants delegated fiduciary functions or responsibilities are also fiduciaries of the Plan under 29 U.S.C. §§ 1002(21)(A) and 1105(c)(2). Because any such individuals or entities that have been delegated fiduciary responsibilities are not currently known to Plaintiffs, they are collectively named in this Complaint as Does 1-20 and included in all references to "Defendants" collectively.

### The Mercy Plan

17. The Mercy Plan was established in 1991 and was formerly known as the Mercy Health System Employees' Matched Savings Retirement Plan. The Mercy Plan is a defined contribution plan. Eligible employees of participating health care providers may defer income and income tax by contributing to the Mercy Plan. Participants also may receive matching contributions from their employer and are eligible for discretionary employer contributions. Participants also may contribute after-tax income ("Roth" contributions) to the Mercy Plan.

18. Defendants have long maintained a contract with the insurance group now known as Voya (formerly ING) to provide administrative services to the Mercy Plan. From thousands of investment options available on Voya's platform, Defendants have maintained a menu of options that consists of around 50 investment funds representing various asset classes and investment

6

styles, including several Voya-managed funds. Defendants also have offered a managed account service through Morningstar, an investment data and analytics firm. Through its service, Morningstar uses a computer model to allocate enrolled participants' accounts among the investment funds available in the Mercy Plan.

### The Rockford Plans

19.     System Corporation merged with the Rockford Health network to create what is now Mercy Health. Rockford Health maintained several defined contribution plans prior to the merger. One plan, the Rockford Health System Code 403(b) Plan, was merged into the Mercy Plan in 2017 and ceased to exist. Others, including the RHS Plan and the RHP Plan, were consolidated for administrative purposes under Mercy Health's control and ceased accepting new contributions, yet maintain formal status as distinct plans.

20.     Prior to the merger, the Rockford plans employed an alternate administrative vendor and maintained different menus of investments than the Mercy Plan. Through the merger, Mercy Health moved the Rockford plans to its longstanding arrangement with Voya. As a result of these changes, the Plans have a common sponsor and administrator, common menu of investment options, and common administrative service vendor in Voya. The assets of all Plans also generate sales commissions for Defendants' broker.

21.     The Plans have around $613 million in combined assets as of the most recently reported year (2018): $492 million in the Mercy Plan, $114 million in the RHS Plan, and $7 million in the RHP Plan. The Plans also reported a total of 15,435 active accounts: 11,006 in the Mercy Plan, 3,733 in the RHS Plan, and 696 in the RHP Plan. Many participants, like Plaintiff Hill, hold accounts in multiple Plans.

## ERISA'S DUTY OF PRUDENCE

22.     ERISA imposes strict fiduciary duties upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

[A] fiduciary shall discharge his duties with respect to a plan …

    (A)    for the exclusive purpose of

        (i)    providing benefits to participants and their beneficiaries; and

        (ii)    defraying reasonable expenses of administering the plan;

    (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

These fiduciary duties are the "highest known to law." *George*, 814 F. Supp. 2d at 852 (citing *Chao v. Hall Holding Co.,* 285 F.3d 415, 426 (6th Cir. 2002)).

23.     "If there is…a 'hallmark' of a fiduciary activity identified in the statute, it is prudence." *Sweda v. Univ. of Penn.*, 923 F. 3d 320, 333 (3d Cir. 2019). This is not a lay person standard, but instead "requires expertise in a variety of areas[.]" Dep't of Labor, *Meeting Your Fiduciary Responsibilities* (Sept. 2017).[2] Fiduciaries have a "duty to exercise prudence in selecting investments" as well as a "continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) ("*Tibble I*").

24.     "Rather than explicitly enumerating *all* of the … duties of fiduciaries [in ERISA], Congress invoked the common law of trusts to define the general scope of their … responsibility." *Chesemore v. Fenkell*, 829 F.3d 803, 811 (7th Cir. 2016) (quoting *Cent. States, Se. & Sw. Areas*

---

[2] *Available at* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

*Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985). Under ERISA, as under the common law of trusts, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." *See* Restatement (Third) of Trusts § 90(c)(3) (2007); *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) ("'[C]ost-conscious management is fundamental to prudence in the investment function' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'") ("*Tibble II*") (quoting Restatement § 90); *see also George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (plan fiduciary had a "duty to ensure that … fees were reasonable.").

25.     The Restatement of Trusts places special emphasis on a fiduciary's duty to monitor commissions and other fees assessed through investment funds:

> ***The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles.***

Restatement (Third) of Trusts ch. 17, intro. note (2007) (emphasis added).

## I.     DEFENDANTS FAILED TO MONITOR OR CONTROL EXCESSIVE COMMISSIONS PAID BY THE PLANS.

26.     Under Defendants' direction and control, the Mercy Plan made one of the largest—if not the largest—broker commission payments by a defined contribution plan (out of more than 600,000 such plans) in each of the last five reported years (2014-2018).[3] After the Mercy-Rockford merger, Defendants authorized additional commissions to their broker from the Rockford plans.

---

[3] Based on all "sales and base commissions paid" entries reported on Schedule A of Form 5500 by all defined contribution plans (over 600,000 such plans in total).  Data for 2019 and 2020 are not yet available. The Mercy Plan's commission payment ranged from the second to seventh largest payment reported by a defined contribution plan in each year. However, in 2015-2018, the few larger payments appear to be the result of decimal placement errors. Therefore, after adjusting for reporting errors, the Mercy Plan appears to have made the largest commission payment of any defined contribution plan in each of the last four years.

*Illustration 1 – The Plans' Broker Commissions, 2014-2018*

|  | Mercy Plan Commission Amount | Additional Rockford Plan Commissions | Total Commission Amount |
|---|---|---|---|
| 2014 | $658,459 | - | $658,459 |
| 2015 | $710,887 | - | $710,887 |
| 2016 | $726,872 | - | $726,872 |
| 2017 | $1,302,343 | $47,964 | $1,350,307 |
| 2018 | $1,092,888 | $289,001 | $1,381,889 |

27.     Other similar plans either do not pay broker commissions or do not pay broker commissions on nearly the same scale. In 2018, there were 667 defined contribution plans with between $200 million and $600 million in assets at year-end that used a contract with an insurance company as the plan's funding vehicle. Many of these plans are sponsored by health care providers like the Plans. Many also operate under section 403(b) of the tax code like the Mercy Plan. Only 119 of the 667 plans in this group reported paying any broker commissions or fees in 2018. The Mercy Plan topped the list and was alone in paying in excess of $1 million to brokers. The median payment to brokers was only around $8,000, and only 13 plans paid more than $100,000.

*Illustration 2 – Peer Plans and Payments to Brokers, 2018*

| Number of Peer Plans (excluding the Plans)[4] | Number of Peer Plans with Reported Broker Payments | Median Sum of all Broker Payments[5] By Peers | Number of Peer Plans with Total Broker Payments in Excess of $100,000 | Number of Peer Plans with Total Broker Payments in Excess of $1,000,000 |
|---|---|---|---|---|
| 666 | 118 | $7,797 | 12 | 0 |

---

[4] The peer universe in this illustration includes all defined contribution plans that reported plan-year 2018 assets between $200 million and $600 million and "insurance" as the plan's funding arrangement.

[5] This category is broader than the single commission payments examined in Paragraph 26 and footnote 3 and includes the total amount reported by a plan on Schedules A for broker commissions and broker fees to all brokers.

28.     The Plans' excessive commissions are funded in part through the excessive investment fees added to many Plan investment options. Defendants generate these commissions by holding share classes of investment options that have extra fees earmarked for brokers included in the expense ratios. As shown in Illustration 3, identical investment options are available at lower cost without the broker fees:

*Illustration 3 – Examples of Plan Menu Options with Cheaper Available Shares[6]*

|  | Plan Shares Expense Ratio | Cheaper Available Expense Ratio | Percent Markup by Plan Shares |
|---|---|---|---|
| American Funds 2010 Target Date | 0.66% | 0.31% | 113% |
| American Funds 2015 Target Date | 0.66% | 0.31% | 113% |
| American Funds 2020 Target Date | 0.66% | 0.31% | 113% |
| American Funds 2025 Target Date | 0.68% | 0.33% | 106% |
| American Funds 2030 Target Date | 0.70% | 0.35% | 100% |
| American Funds 2035 Target Date | 0.72% | 0.37% | 95% |
| American Funds 2040 Target Date | 0.73% | 0.38% | 92% |
| American Funds 2045 Target Date | 0.73% | 0.38% | 92% |
| American Funds 2050 Target Date | 0.74% | 0.39% | 90% |
| American Funds 2055 Target Date | 0.75% | 0.40% | 88% |
| American Funds 2060 Target Date | 0.76% | 0.41% | 85% |
| American Funds EuroPacific Growth | 0.84% | 0.49% | 71% |
| American Funds Income Fund | 0.61% | 0.26% | 135% |
| American Funds New World | 0.95% | 0.60% | 58% |
| Invesco Diversified Dividend Fund | 0.52% | 0.42% | 24% |
| MassMutual Select Mid Cap Growth Fund | 0.81% | 0.71% | 14% |
| MFS Value Fund | 0.82% | 0.47% | 74% |
| Voya Intermediate Bond Fund | 0.70% | 0.31% | 126% |
| Voya Large Cap Growth | 0.92% | 0.67% | 37% |
| Voya Russell Large Cap Index | 0.61% | 0.36% | 69% |
| VY T Rowe Price Capital Appreciation | 0.89% | 0.64% | 39% |

---

[6] Examples of share class issues in Illus. 3, and fee rebates misdirected by Defendants in Illus. 4 (see *infra*), are illustrative and not exhaustive.

29.     The difference in cost between share classes is not the only source of excessive commissions paid to Defendants' broker. Many investment funds in the Plans offer fee rebates that Defendants have allowed to be used to fund broker commissions. In other words, even if the Plans are invested in the lowest cost share class available to the Plans, the manager of the fund may still return part of the fee to the Plans for Defendants to use in their discretion. Several investment funds in the Plans provide these additional rebates, and Defendants have allowed the rebates to be used in part to add to the Plans' excessive broker commissions (instead of passing these rebates on to participants).

*Illustration 4 – Examples of Plan Menu Options with Fee Rebates*

|  | Total Expense Ratio | Rebate |
|---|---|---|
| Dodge & Cox Global Stock Fund | 0.62% | 0.10% |
| Fidelity Blue Chip Growth Fund | 0.80% | 0.25% |
| Fidelity Contrafund | 0.82% | 0.25% |
| Northern Funds Small Cap Value Fund | 1.00% | 0.40% |
| Voya Corporate Leaders 100 Fund | 0.49% | 0.25% |
| Voya SmallCap Opportunities | 0.88% | 0.25% |
| VY American Century Small-Mid Cap Value | 0.86% | 0.28% |
| VY BlackRock Inflation Protected Bond | 0.54% | 0.28% |
| VY Clarion Global Real Estate | 0.87% | 0.28% |
| VY Invesco Opportunities Global | 0.75% | 0.28% |
| VY T Rowe Price Diversified Mid Cap Growth | 0.77% | 0.28% |

30.     Additionally, the Plans' managed account fees are inflated to generate further commissions for Defendants' broker. The typical base fee for a plan the size of the Plan to utilize Morningstar's managed account service through Voya is around 0.25%. Additional fees may be added for Voya's administrative services, up to 0.25%. Yet, Defendants authorize a 0.65% total charge to participants in the Plans for the managed account service, which reflects a broker's

premium of at least 0.15% added on top of the Morningstar and Voya fees. In other words, the Plans could offer this same service for 0.50% (or less) without the commission.

31.     Other plans illustrate the prudent actions that Defendants failed to take. Defined contribution plans with hundreds of millions of dollars to invest (or less) can obtain the lowest cost versions of investment products and services and avoid broker commissions altogether. Indeed, as noted in Illustration 2, *supra*, the majority of similar plans do not pay any broker commissions or broker fees at all. Additionally, as shown in Illustrations 5-6, similar plans that hold the exact same investment products and services offer lower cost versions of those products and services:

*Illustration 5 – Examples of Share Classes Held, the Plans vs. Similar Plans*

| | Net Assets | American Funds TDF - R4 Class 0.61%-0.76% | American Funds TDFs - R6 Class 0.31%-0.41% |
|---|---|---|---|
| Elliot Health System | $230 million | | ✓ |
| Childrens Hospital of Orange County | $271 million | | ✓ |
| South Shore Hospital | $375 million | | ✓ |
| Lester E. Cox Medical Center | $486 million | | ✓ |
| Creighton University | $500 million | | ✓ |
| **The Plans[7]** | **$643 million** | ✓ | |

*Illustration 6 – Examples of Morningstar Expense Ratios, the Mercy Plan vs. Similar Plans*

| | Net Assets | Morningstar Managed Accounts Total Expense Ratio |
|---|---|---|
| Celebrate the Children | $5 million | 0.50% |
| Mercedes-Benz | $572 million | 0.40%-0.50%[8] |
| **Mercy Plan[9]** | **$492 million** | **0.65%** |

---

[7] As the result of Defendants' common administration of the Plans, the Rockford plans can obtain the same pricing as the Mercy Plan. Defined contribution providers look at the total assets that one client or fiduciary decisionmaker brings to the relationship to determine pricing.

[8] Many plans offer lower fees for larger balances invested through Morningstar (e.g, 0.50% initially, 0.45% over $100K, and 0.40% over $250K). According to the Mercy Plan's disclosures, it does not appear that Defendants have negotiated fee discounts for larger balances.

[9] It does not appear that Morningstar's managed account service is available in the legacy Rockford plans (which are frozen to new contributions, see *supra*, at ¶ 19).

32.     While similar plans largely avoid broker commissions by obtaining lower cost share classes designed for institutional investors, prudent fiduciaries that do work with brokers avoid overpaying them.[10] The Trader Joe's plan illustrates how Defendants could have recaptured excess broker fees on behalf of the Plans. Like the Plans, the Trader Joe's 401(k) plan has held higher cost "R4" shares of investment funds managed by American Funds. These R4 shares deducted the same extra fees in the Trader Joe's plan as in the Plans. However, unlike Defendants, Trader Joe's negotiated a cap on its broker's compensation. The broker receives a flat $300,000 per year, and the remaining "broker" fees—in excess of $2 million each year since 2015—are reimbursed to the Trader Joe's plan. Trader Joe's distributes the bulk of the reimbursed fees to participant accounts, and a smaller sum is held in trust to offset non-broker expenses that would otherwise be charged to participants.[11]

33.     In contrast, Defendants have failed to prudently monitor or control their broker's compensation from the Plans. It does not appear that Defendants have taken any steps to negotiate a cap on the broker's compensation or obtain reimbursement of excess fees. While it is not per se imprudent to employ a broker, it is imprudent to allow broker compensation to balloon unchecked as Defendants have done.

34.     Defendants have access to a marketplace replete with alternate providers capable of delivering an equal or greater level of service to the Plans at a small fraction of the cost. In exchange for record-high commissions, Defendants' broker ostensibly offers some service to the Plans. This service appears to consist of providing a point of contact for participants for questions

---

[10] *See supra*, at ¶ 25 (citing the Restatement of Trusts and a fiduciary's "duty to be cost conscious" with respect to "commissions", "agent fees", and other charges "associated with mutual funds and other pooled investment vehicles").

[11] The reimbursement of broker fees and cap on broker compensation in the Trader Joe's plan is described in the Auditor's Reports appended to Form 5500 filings by the Trader Joes's plan.

about the Plans and a source of counsel for Defendants regarding which investments to include in the Plans. The broker's contacts with participants also may include educational meetings.[12] While the value of these services is highly questionable,[13] the excess cost to the Plans relative to the marketplace is plain.

35.     To determine the excessiveness of the compensation received by Defendants' broker, Plaintiffs analyzed all plans with between $200 and $600 million in assets that use an insurance contract as the plan funding vehicle and hired an investment advisor that provides services comparable to the services made available by Defendants' broker.[14] This analysis reveals that the services made available by Defendants' broker have (at best) a market value of approximately one-tenth the amount of actual annual compensation that Defendants' broker has received from the Plans in recent years. The average amount paid for these services is between $100,000 and $150,000, whereas Defendants' broker received more than $1.3 million from the Plans in 2018.

36.     Defendants' failure to control the broker's compensation from the Plans is especially imprudent because Defendants promote their broker in employee guides as the provider of choice for non-ERISA financial products like life insurance, 529 college savings plans, and additional retirement accounts. The broker receives significant revenue from these referrals and

---

[12] Any compensation received from the Plans for such meetings is problematic due to the broker's sale of other financial products to the Plans' participants. *See infra*, at ¶ 36.

[13] Plaintiffs note that there does not appear to be any Plan function for which the broker's services are necessary. Participants may enroll in the Plans, obtain answers to questions, study investment options, and make changes to their accounts directly through Voya. Moreover, the Plans' investments are not customized for the Plans, and there is little change in the menu year-to-year. Any effort expended by the broker to research investments and provide counsel to Defendants is likely minimal.

[14] This analysis examines payments classified as service provider compensation for investment consulting or insurance agent or broker services on Schedule C to Form 5500, where the service provider offers services similar to those offered by Defendants' broker.

appears to place a high value on the Mercy Health relationship. Indeed, the broker is a frequent sponsor of fundraisers for Defendants' foundation.[15] Defendants therefore have substantial leverage to limit any compensation paid by the Plans to a reasonable level. Yet they have not.

37. These facts, taken together, provide a reasonable inference that Defendants have failed to exercise the requisite level of prudence, care, skill, and diligence typically exercised by fiduciaries of similarly-sized retirement plans to monitor and limit their broker's compensation paid by the Plans.

## II. DEFENDANTS FAILED TO MONITOR POOR INVESTMENT PERFORMANCE BY THE VOYA FUNDS.

38. Defendants also failed to prudently monitor the underperforming Voya funds included as investment options in the Plans. The Voya funds are not competitive investment offerings in the large plan marketplace. Voya relies on its administrative service relationships to promote and sell its proprietary funds. Most of these relationships are with smaller plans that do not have the scale to access institutional pricing, curate their investment menus, or obtain independent advice. However, these limitations do not apply to the Plans. A reasonable fiduciary of a plan the size of the Plans would only retain Voya funds based on merit, and never in deference to its administrative services vendor.

39. Defendants did not retain the Voya funds based on merit. As Illustration 7 shows, Voya's three actively-managed equity funds in the Plans underperformed their benchmark indexes by -1.50% to -2.21% per year between 2015 and 2019. Yet Defendants have retained all three funds as investment options in the Plans. Notably, two of the Voya equity funds did not have *any*

---

[15] The genealogy of Defendants' broker relationship is continuous to the establishment of the Mercy Plan in 1991. The current broker began working for the original broker in around 2000 and took over the Mercy account sometime thereafter.

other ERISA defined contribution plan investors as large as the Plans as of the most recently reported year. The third had only three plans of this size invested in the fund—all other Voya recordkeeping customers.

*Illustration 7 – Underperformance of Voya Active Equity Funds in the Plans*

|  | Benchmark Index | 5-Year Annualized Underperformance Relative to Benchmark (through 12/31/19) | Plans' Size Relative to Other ERISA D/C Plan Investors |
|---|---|---|---|
| **Voya Corporate Leaders 100** | S&P 500 | -2.11% | Largest |
| **Voya SmallCap Opportunities Port** | Russell 2000 Growth | -2.21% | Largest |
| **Voya Large Cap Growth Port** | Russell 1000 Growth | -1.50% | 4th Largest |

40.    The marketplace was replete with lower cost, better-performing actively-managed funds that follow similar investment strategies as the Voya funds, as well as lower cost index funds that successfully tracked the same benchmark indexes over long periods. As Illustration 8 shows, superior alternatives would have generated higher returns for the Plans and were favored by fiduciaries of similarly-sized plans.

*Illustration 8 –Voya Active Equity Funds vs. Superior Alternatives*

*Voya Corporate Leaders 100*

|  | Net Exp Ratio | 5-Year Annual Outperformance Relative to Voya Fund (through 12/31/19) | $200-$600 million Plans Invested |
|---|---|---|---|
| **Voya Fund** | 0.49% | - | 2 |
| **Similar Passive Fund (VINIX)** | 0.04% | +2.08% | 809 |
| **Similar Active Fund 1 (RWMGX)** | 0.27% | +1.37% | 113 |
| **Similar Active Fund 2 (JUEMX)** | 0.44% | +1.56% | 45 |

17

*Voya SmallCap Opportunities Portfolio*

|  | Net Exp Ratio | 5-Year Ann. Outperformance Relative to Voya Fund (through 12/31/19) | $200-$600 million Plans Invested |
|---|---|---|---|
| **Voya Fund** | 0.86% | - | 2 |
| **Similar Passive Fund (VRTGX)** | 0.08% | +2.36% | 2 |
| **Similar Active Fund 1 (ODIIX)** | 0.66% | +5.93% | 7 |
| **Similar Active Fund 2 (JVTNX)** | 0.67% | +3.08% | 13 |

*Voya Large Cap Growth Portfolio*

|  | Net Exp Ratio | 5-Year Ann. Outperformance Relative to Voya Fund (through 12/31/19) | $200-$600 million Plans Invested |
|---|---|---|---|
| **Voya Fund** | 0.92% | - | 4 |
| **Similar Passive Fund (TILIX)** | 0.05% | +1.43% | 27 |
| **Similar Active Fund 1 (HACAX)** | 0.67% | +1.49% | 132 |
| **Similar Active Fund 2 (JLGMX)** | 0.44% | +2.39% | 77 |

41.     Voya's actively-managed bond fund, the Voya Intermediate Bond Fund, also did not merit retention by the Plans. The Voya fund cost significantly more compared to other available bond funds with similar investment strategies. And while the Voya fund appeared to beat its prospectus benchmark, that performance measure is misleading. The Voya fund uses an aggregate bond index benchmark that represents higher quality, shorter-term debt securities than the Voya fund holds in fact. As Illustration 9 shows, lower-cost passive and actively-managed bond funds with similar holdings consistently outperformed Voya's fund. Not surprisingly, these superior alternatives also were favored by similarly-sized plans.

18

*Illustration 9 – Voya's Active Bond Fund vs. Superior Alternatives*

**Voya Intermediate Bond A**

|  | Net Exp Ratio | 5-Year Ann. Outperformance Relative to Voya Fund (through 12/31/19) | $200-$600 million Plans Invested |
|---|---|---|---|
| **Voya Fund** | 0.70% | - | 12 |
| **Similar Passive Fund (VBIMX)** | 0.05% | +0.10% | 65 |
| **Similar Active Fund 1 (WACPX)** | 0.45% | +1.21% | 61 |
| **Similar Active Fund 2 (DODIX)** | 0.42% | +0.24% | 203 |

42. These facts, taken together, provide a reasonable inference that Defendants have failed to exercise the requisite level of prudence, care, skill, and diligence in monitoring the Voya funds and in retaining Voya's funds as investment options in the Plans.

**III. PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' BREACH OF PRUDENCE.**

43. Plaintiffs did not have knowledge of all material facts (including, among other things, the aggregate compensation paid to Defendants' broker by the Plans, the compensation paid by other similar plans to investment advisors for similar services, the fee markups charged by investment products and services in the Plans, and the similar, superior investment options retained by fiduciaries of similarly sized plans) until shortly before this suit was filed. Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making and monitoring processes with respect to the Plans because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

44.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plans to bring an action on behalf of the Plans to seek the remedies provided by 29 U.S.C. § 1109(a). In addition, 29 U.S.C. § 1132(a)(3) authorizes any participant or beneficiary to bring suit for injunctive or other equitable relief. Plaintiffs seek certification of this action as a class action pursuant to these statutory provisions and Fed. R. Civ. P. 23.

45.     Plaintiffs assert their claims against Defendants on behalf of a class of participants and beneficiaries of the Plans defined as follows:[16]

> All participants and beneficiaries of the Mercy Plan at any time on or after August 3, 2014, and all participants and beneficiaries of the RHS Plan and RHP Plan at any time on or after January 1, 2017, excluding Defendants, any of their directors, and any officers or employees of Defendants with responsibility for the Plans' investment or administrative functions.

46.     Numerosity:   The Class is so numerous that joinder of all Class members is impracticable. The Plans have thousands of participants.

47.     Typicality:     Plaintiffs' claims are typical of the Class members' claims. Plaintiffs participated in the Plans, were subject to the same fees as other Class members, and were offered to the same investment menu and managed account service as other Class members.  Defendants managed the Plans collectively and treated Plaintiffs consistently with other Class members. Defendants' imprudent actions and omissions affected all class members similarly.

48.     Adequacy:     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do

---

[16] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

49.     <u>Commonality</u>:  Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

    a.  Whether Defendants are fiduciaries of the Plans, and the scope of their fiduciary duties;

    b.  Whether the Plans' fiduciaries breached their fiduciary duties under 29 U.S.C. § 1104 by engaging in the conduct described herein;

    c.  The proper form of equitable and injunctive relief; and

    d.  The proper measure of monetary relief.

50.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

51.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as replacement of investments or service providers or removal of Plan fiduciaries, would be dispositive of non-party participants' interests. The restoration of assets of the Plans that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

52.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

**COUNT I**
**Breach of the Duty of Prudence**
**29 U.S.C. § 1104**

53.     Plaintiffs repeat and re-allege Paragraphs 1 through 52 of the Complaint as though fully set forth herein.

54.     Defendants are or were fiduciaries of the Plans under 29 U.S.C. §§ 1002(21).

55.     29 U.S.C. § 1104 imposes fiduciary duties upon Defendants in their administration of the Plans and in their selection and monitoring of the Plans' service providers and investments. Section 404(a) of ERISA, 29 U.S.C. § 1104(a), provides:

[A] fiduciary shall discharge his duties with respect to a plan ...

(A)     for the exclusive purpose of

22

(i)     providing benefits to participants and their beneficiaries; and

(ii)    defraying reasonable expenses of administering the plan; [and]

(B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

56.    Defendants breached their fiduciary duty by authorizing excessive and unreasonable compensation to be paid to their broker from the Plans. A prudent fiduciary would have monitored the broker's compensation, benchmarked that compensation against arrangements for similar services made by similar plans, harnessed the leverage of Defendants' other referrals to the broker, prohibited any compensation from the Plans for work that involves the broker's sale of non-ERISA products to participants, and negotiated a reasonable rate of compensation for any legitimate services provided by the broker to the Plans. Defendants failed to take these prudent measures to monitor and control the broker's compensation and therefore breached their duty of prudence to the Plans.

57.    Defendants also breached their fiduciary duty by retaining underperforming Voya funds affiliated with the Plans' administrative services provider. A prudent fiduciary would have evaluated these funds on merit without any preference or favor given to Voya. Instead, Defendants have tolerated persistent underperformance by Voya funds despite the availability of similar funds at lower cost from other managers with superior track records. The actions of other fiduciaries confirm that the Voya funds retained by Defendants are not competitive in the marketplace, whereas superior alternatives are common choices. Defendants' investment selection and monitoring efforts with respect to underperforming Voya funds have failed to satisfy ERISA's standard of prudence.

58. Defendants' fiduciary breaches resulted in significant losses to the Plans. Each Defendant is liable for the losses that resulted from these fiduciary breaches, as well as equitable relief and other relief as provided by ERISA. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2)-(3).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, as representatives of the Class defined herein, and on behalf of the Plans, pray for relief as follows:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A declaration that Defendants have breached their fiduciary duties under ERISA;

D. An order compelling Defendants to personally make good to the Plans all losses that the Plans incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plans to their position but for this unlawful conduct;

E. An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

F. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

G. An award of pre-judgment interest;

H. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

I. An award of such other and further relief as the Court deems equitable and just.

Dated: August 3, 2020                      **THE PRINZ LAW FIRM, P.C.**

s/Kristen Prinz
Kristen Prinz, IL Bar No. 6291900
1 East Upper Wacker Drive
Suite 2500
Chicago, IL 60601
Telephone: (312) 212-4450
Facsimile: (312) 284-4822
kprinz@prinz-lawfirm.com

**NICHOLS KASTER, PLLP**
Paul J. Lukas, MN Bar No. 22084X*
    *Admitted in N.D. Ill.*
Kai H. Richter, MN Bar No. 0296545**
Brock J. Specht, MN Bar No. 0388343**
Chloe A. Raimey, MN Bar No. 0398257**
    ** *pro hac vice applications forthcoming*
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
lukas@nka.com
krichter@nka.com
bpsecht@nka.com
craimey@nka.com

ATTORNEYS FOR PLAINTIFFS